# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

NICHOLAS V.,[1]                                    Case No. 1:21-cv-408

       Plaintiff,                              Dlott, J.
   v.                                           Bowman, M.J.

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.


## REPORT AND RECOMMENDATION

Plaintiff Nicholas V. filed this Social Security appeal in order to challenge the Defendant's finding that he is not disabled.  *See* 42 U.S.C. §405(g).  Proceeding through counsel, Plaintiff presents two claims of error.  As explained below, I conclude that the non-disability decision is supported by substantial evidence in the record as a whole and therefore should be AFFIRMED.

### I.  Summary of Administrative Record

On August 25, 2019, Plaintiff filed applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI"), alleging disability beginning on June 5, 2013 (subsequently amended to February 5, 2014), due primarily to anxiety and chronic pain.[2] (Tr. 26, 57).  After his applications were denied initially and on reconsideration, Plaintiff requested an evidentiary hearing.  On November 19, 2020,

---

[1]Due to significant privacy concerns in social security cases, this Court refers to claimants only by their first names and last initials.  *See* General Order 22-01.
[2]The ALJ stated that she would consider disability beginning on February 5, 2014 based upon a prior adverse determination on an initial application.  Through counsel, Plaintiff orally agreed that he was not seeking to reopen the prior adjudication. (Tr. 57).

Plaintiff appeared by telephone with counsel and testified before Administrative Law Judge ("ALJ") Thuy-Anh Nguyen.  A vocational expert also testified.  (Tr. 50-103).  On December 17, 2020, the ALJ issued an adverse decision. (Tr. 23-43).

Plaintiff was 30 years old on the alleged onset of disability in February 2014, and remained in the "younger individual" age category at the time of the ALJ's decision.  (Tr. 42).  He has the equivalent of a high school education, with some college coursework. (Tr. 31, 42).  He previously worked as a property manager at the heavy exertional level. (Tr. 91-92).  Plaintiff testified that he was injured at work years before his alleged onset of disability, in June of 2007, when he fell from a second store balcony and shattered his right heel. (Tr. 67-68).  He underwent foot surgery in 2008.  Since then, he has suffered from pain in his back, hips, knees, ankles and both feet, with the pain worse on his right side.  (Tr. 72).  Plaintiff has been living with his fiancée and her two school-aged daughters for two and a half years; he and his fiancée also have a baby girl together. (Tr. 83-84).

Although he has engaged in some work activity, Plaintiff testified that he has not worked at the substantial gainful activity level since his alleged onset of disability.  For purposes of DIB, his date last insured ("DLI") was September 30, 2017.  Therefore, the relevant period for DIB is February 5, 2014 through September 30, 2017,[3] and the relevant period for SSI is July 31, 2019 through the date of the ALJ's decision.  (Tr. 27).

For the combined periods (February 2014 through December 2020), the ALJ determined that Plaintiff had the following severe impairments: "residuals status post surgery and fracture of right calcaneus, osteoarthritis, disorder of the spine, reflex sympathetic dystrophy, and anxiety disorder."  (Tr. 29).  In addition, the ALJ found a non-

---

[3]To be entitled to DIB, a claimant must establish disability prior to his date last insured.

severe impairment of status post left wrist fracture. (*Id.*)  With respect to headache complaints, the ALJ found no "medically determinable impairment for primary headache disorder." (Tr. 30).  Considering all impairments, the ALJ determined that none met or medically equaled the severity of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appx. 1, such that Plaintiff would be entitled to a presumption of disability.  (*Id.*)

 After considering the record, the ALJ determined that, while Plaintiff can no longer perform his past work, he retains the residual functional capacity ("RFC") to perform sedentary work, defined as lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. *See* 20 C.F.R. §416.967(a); (Tr. 32).  However, the ALJ added that Plaintiff can only

> occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl. The claimant must avoid concentrated exposure to working around hazardous, moving machinery; and no commercial driving. He is limited to simple, routine tasks that do not involve prolonged concentration for task completion; no fast pace or high production quotas; and change of duties are infrequent in nature.

(Tr. 32).

Considering Plaintiff's age, education, and RFC, and based on testimony from the vocational expert, the ALJ determined that Plaintiff could still perform a "significant number" of other jobs in the national economy, including representative jobs of inspector, document specialist, and lens gauger. (Tr. 42-43). Therefore, the ALJ determined that Plaintiff was not under a disability.  The Appeals Council denied further review, leaving the ALJ's decision as the final decision of the Commissioner.  Plaintiff filed a lengthy Statement of Errors in which he challenges the ALJ's assessment of his RFC and of the medical opinion evidence.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted). *See also, generally*, *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (holding that substantial evidence is evidence a reasonable mind might accept as adequate to support a conclusion and that the threshold "is not high").

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity ("SGA"); at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520(g), 404.1560(c), 416.920(g) and 416.960(c).

A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. §§ 404.1512(a); 416.912(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job. *See* 42 U.S.C. § 423(d)(1)(A).

**B. Summary of Relevant Medical Records**

Because Plaintiff's 39-page Statement of Errors broadly attacks the ALJ's analysis of the entirety of the record as a "mischaracterization," the undersigned summarizes that record in some detail. As the ALJ noted, the vast majority of the records are from Plaintiff's long-term primary care physician, Dr. Rath. Plaintiff also submitted pain management records from Dr. Blatman, with whom Plaintiff began treating in 2019.

5

**2014-2015**

In February 2014, Dr. Rath prescribed only Xanax for anxiety. (Tr. 33).[4]    In December 2014, Plaintiff reported Xanax was effective.  However, he had increased stress with helping care for his girlfriend's mother. (Tr. 34, 635).  Based on Plaintiff's reports of back pain and right ankle/leg pain with ambulation, Dr. Rath diagnosed chronic low back pain along with the 2007 heel fracture.  Still, he continued the same dose of Xanax without adding pain medication. (Tr. 636).

In March 2015, Plaintiff reported working part time.  Dr. Rath's examination findings were largely unremarkable; he continued Xanax.  At a follow-up in June, Dr. Rath made similar findings and continued Xanax, noting "lot family stress issues." (Tr. 645).  In August 2015, Plaintiff appeared with his arm in a sling for a possible fracture on a recent vacation, and admitted "getting meds from ortho doc for low back pain." (Tr. 649; Tr. 384-89).

**2016**

In February 2016, Plaintiff reported that he was playing poker at a casino for income, that Xanax was still working well for anxiety, and that he was receiving opioids from an unspecified physician for chronic back pain. (Tr. 34, 658).  Plaintiff was mildly anxious but negative for any gait problem.  (Tr. 658)  In May 2016, Plaintiff reported to Dr. Rath that his medications remained helpful and that he "cont[inued] to engage in daily activities without restrictions" (Tr. 34, 663).

Plaintiff occasionally sought Emergency Room care in 2016. Those records reflect sinusitis and bronchitis, but note good range of motion in major joints and otherwise

---

[4]Plaintiff alleges that he was prescribed Lortab in 2014 by a physician he identified as Dr. Cleveland. Dr. Rath's February 2014 note includes the brief note: "lortab reg basis Worker comp case." (Tr. 626). However, Dr. Cleveland's records are not in the administrative record and there are no other records regarding that prescription.

unremarkable musculoskeletal examinations.  (Tr. 419, 432).  Another ER visit in August 2016 for a cut finger similarly noted normal range of motion in all extremities as well as normal neurologic results.  (Tr. 445).

In September, Plaintiff returned to Dr. Rath and reported working in tree service and landscaping.  (Tr. 34).  He reported a prior prescribing physician was scaling back his pain practice and requested pain medications from Dr. Rath. (Tr. 34, 667).   After finding lower back pain to palpation, lordosis curvature and heel pain on examination, Dr. Rath diagnosed reflex sympathetic dystrophy and unspecified fracture morphology of the right calcaneus, for which he prescribed Oxycodone, as well as Requip for restless leg syndrome.  (Tr. 667-669).  Dr. Rath noted that he had a "long discussion on compliance and zero tolerance for lost or missing [prescriptions] or other excuses." (Tr. 34, Tr. 668).

In December 2016, Plaintiff reported working in property management.  (Tr. 672). Dr. Rath noted ankle pain with loss of motion, back tightness in the lumbar area and a negative straight leg raising test.  He added lidoderm skin patches for pain. (Tr. 673-674).

**2017**

On March 10, 2017, Dr. Rath noted anxiety and decreased sensation in Plaintiff's feet.  However, he also found a negative straight leg raise and a stable gait and charted that Plaintiff was in "no distress."  (Tr. 34, 681-82).   Ten days later on March 20, 2017, Dr. Rath found low back pain.  For the first time, he found a positive straight leg test with bilateral leg pain and a gait that was "flexed and sidebent" without a foot drop.  Plaintiff appeared "distressed"  - one of the few times so noted.  (Tr. 692-693). Dr. Rath continued Xanax, Requip, Oxycodone and Lidoderm patches for pain, but added Neurontin and ordered an electromyogram.  The EMG was "suggestive but not entirely diagnostic" for "mild bilateral L4 radiculopathies with no evidence of myopathy, diffuse peripheral

7

neuropathy or other focal mononeuropathy involving the lower extremities." (Tr. 34, 692; *see also* Tr. 343).

In June 2017, Plaintiff complained that the physical work he was doing in his property management job was increasing his pain due to being on his feet a lot with increased walking. (Tr. 696). Dr. Rath found right foot pain and some decrease in sensation in his feet and low back pain, but once again noted a negative straight leg test. (Tr. 696-697). In August 2017, Plaintiff was seen for follow up for low back pain with bilateral radiation into his legs, and knee pain on ambulation. He again appeared "distressed," and Dr. Rath ordered an MRI. (Tr. 701).

In November 2017, Plaintiff reported consulting with Dr. Kumar for pain management[5] but requested a referral to Dr. Minhaus instead. (Tr. 705). He was in "[n]o distress," despite foot and ankle pain and a decrease in motion. (Tr. 705-06). Dr. Rath agreed to refill Plaintiff's Percocet only until he was seen by Dr. Minhaus, stressing that he needed to keep that appointment. At a follow-up in December 2017, Dr. Rath found arthralgias, back pain and decreased concentration due to anxiety. (Tr. 710). However, he noted that Plaintiff's functioning "continues with improved or maintaining ADL's." (Tr. 712). Dr. Rath also charted that Plaintiff is "manipulative with requests." (Tr. 711).

**2018**

On January 2, 2018, Plaintiff reported a "new job at car dealership" that required less physical stress on his legs and back than his previous property management job. (Tr. 35). Dr. Rath again noted that Plaintiff "tends to be manipulative in requests for meds etc." (Tr. 715). Nevertheless, after diagnosing anxiety, anthralgias, back pain and a gait

---

[5]No records exist for this physician.

problem, he renewed prescriptions including Oxycodone. (Tr. 715-718). Later that month, Plaintiff reported to the ER after being in a car accident, seeking care for neck and shoulder pain. X-rays of his spine and shoulder were normal. (Tr. 34-35, Tr. 517-18).

In May 2018, Plaintiff began chiropractic treatment for cervical pain relating to the car accident. Plaintiff reported that his lower back condition was deteriorating with daily living and the demands of employment, but reported "lasting improvements" with his neck and middle back from chiropractic treatments. (Tr. 351-66). At a subsequent ER visit, medical staff again found good range of motion in all major joints and normal affect, judgment and mood. (Tr. 530).

In February 2018, Plaintiff treated briefly with Dr. Minhaus.[6] In April 2018, Dr. Rath noted that Plaintiff had been terminated from treatment and was working on obtaining an appointment with a new pain doctor, Dr. Blatman. (Tr. 35, 145). The same note states that Plaintiff is anxious and is a "complainer/whiner." (Tr. 146). Dr. Rath agreed to refill Plaintiff's narcotic prescriptions based on pain in Plaintiff's lower back on palpation and chronic right foot pain. However, he "[s]pecifically stated that I will help for 1 month only/instructed not to even ask next month for analgesic." (Tr. 727).[7]

In June 2018, Plaintiff was still working at the used car dealership. He reported anxiety and continued back and leg pain, but was in no distress. (Tr. 782). In September 2018, Plaintiff was positive for a gait problem. (Tr. 787-788). He had foot pain but again exhibited no distress. (Tr. 788). Dr. Rath noted he continued to improve or maintain

---

[6]No records exist for this physician.
[7]Notwithstanding Dr. Rath's apparent reluctance, he continued to prescribe Plaintiff pain medications for another year, until Plaintiff began treating with Dr. Blatman.

ADLs.  Plaintiff was unable to provide a urine sample and Dr. Rath documented that he did not stay around to try to give a specimen.  (Tr. 789).

In December 2018, Plaintiff reported he had continued to work full-time in car sales, that his Xanax was helpful for anxiety, and that other medications also were beneficial.  He was in no distress.  (Tr. 742).

**2019**

In February 2019, Dr. Rath made similar findings, documenting Plaintiff's reports of chronic pain but observing no distress.  (See Tr 748).  In April 2019, Plaintiff presented as a new patient at Blatman Health and Wellness Center.  Dr. Blatman found reduced cervical and shoulder range of motion and multiple areas of muscle spasm and tenderness. He assessed neck pain, back pain, tendinopathy involving hip, closed calcaneus fracture, leg pain, myofascial pain, ankle sprain and insomnia.  In addition to frequent counseling on dietary changes to reduce pain and inflammation, Dr. Blatman prescribed Percocet and recommended rubber ball massage techniques.  (Tr. 875).  At a follow-up in July 2019, Plaintiff reported starting a new job as a project manager and feeling better, without any significant side effects from Percocet.  (Tr. 35, 867-68).  Dr. Blatman continued the same dose of Percocet.

At a return visit to Dr. Rath shortly before his follow-up with Dr. Blatman, in June 2019, Plaintiff complained of increased stress, reporting his girlfriend was pregnant. However, Plaintiff again was observed to be in no distress. (Tr. 752).  Based on his clinical judgment, Dr. Rath denied his request for a higher dose of Xanax and made no other

medication changes.[8]  (*Id*.)  In September 2019, Plaintiff reported continued pain "that interferes with work tolerances," (Tr. 757), but again exhibited "no distress." (Tr. 758).

In October 2019, at a psychological consulting exam with Dr. Twehues, Plaintiff reported he had left his car sales job a year earlier due to pain.  (Tr. 769, 771).  He "walked slowly with a cane and demonstrated some difficulty ambulating."  (Tr. 771).  Plaintiff reported a history of substance abuse (primarily marijuana) which he seemed to minimize.[9]  Dr. Twehues noted it is "quite possible that he is maybe abusing narcotics given his history of substance abuse…."  (Tr. 772).  She opined that his reports of "almost daily panic attacks" and "symptoms of anxiety seemed exaggerated when compared to his clinical presentation." (Tr. 773).  Considering his minimization of substance abuse and "somewhat exaggerated" reports, she concluded that his "self-report data appears somewhat questionable."  (*Id.*)

In November 2019, Plaintiff told Dr. Blatman that his "pain level  8-9/10 with medications.  Just finished moving (family moved most of the items)… He feels like his back went out from doing the lifting and moving, but he also had white [sic] from fast food the night before."  (Tr. 812).  Dr. Blatman did not alter Plaintiff's Percocet, noting it allows physical activity and rest with no significant side effects.  (*Id*.)

**2020**

In February 2020, Plaintiff brought his one-month old baby to his appointment with Dr. Blatman. (Tr. 807).  At another follow-up with Dr. Blatman in June 2020, he reported being "up at 4:00 in the morning with his child who has colic."  (Tr. 824).  Also in June

---

[8]The record reflects that Dr. Rath prescribed Xanax, Lidoderm patches and Gabapentin for pain.  He did not prescribe narcotics after 2019 when Plaintiff began treating with Dr. Blatman.
[9]Based upon his report that he recently had quit using marijuana, she diagnosed "early full remission" of a mild cannabis use disorder. (Tr. 773)

2020, Plaintiff had a telehealth appointment with Dr. Rath.  Dr. Rath observed that, not only was Plaintiff in no acute distress, but he was "walking in yard with no noticeable limitations." (Tr. 842).

During a telehealth visit in July 2020, Plaintiff told Dr. Blatman he was a "stay at home dad.  Loving it."  (Tr. 822).  In August 2020, he told Dr. Blatman "[h]e has more pain with taking care of the 8-month-old child." (Tr. 821).  At a separate August visit with Dr. Rath, that physician noted that Plaintiff was "[p]ositive for decreased concentration" and presented as "nervous/anxious." (Tr. 838).  However, Dr. Rath again observed he was "not in acute distress." (Tr. 826).  Dr. Rath suggested reducing gabapentin for pain control and titrating dose of Xanax downward but Plaintiff objected. (Tr. 839).

### B.   Plaintiff's Claims of Error

### 1.  The ALJ's RFC Analysis Was Not Overly Selective

Plaintiff first argues that the entire RFC is based upon a mischaracterization of the record, particularly concerning limitations in "focus, attention and concentration and with reliability." (Doc. 10 at 22).

The argument that the ALJ mischaracterized or "cherry-picked" the record is frequently made and seldom successful, because "the same process can be described more neutrally as weighing the evidence." *White v. Commissioner,* 572 F.3d 272, 284 (6th Cir. 2009).  The narrow scope of judicial review of the Commissioner's final administrative decision does not include re-weighing evidence, deciding questions of credibility, or substituting the court's judgment for that of the ALJ. *See Ulman v. Commissioner,* 693 F.3d 709, 713 (6th Cir. 2012).  On the record presented here, the undersigned finds no error.

12

At the heart of Plaintiff's criticism is the ALJ's negative evaluation of his subjective complaints. Many non-disability determinations are affirmed notwithstanding evidence to support some level of chronic pain.  *See generally*, *Blacha v. Sec'y of HHS*, 927 F.2d 228, 231 (6th Cir. 1990) (affirming ALJ's determination that pain from nerve root compression due to herniated disc and degenerative changes did not preclude all work).   While subjective pain complaints can support disability, cases based on allegations of disabling pain that are not wholly supported by objective evidence are often among the most difficult to resolve. That is one reason why an ALJ's assessment of subjective symptoms including pain complaints is generally given great deference.   *See Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). In fact, a credibility/consistency determination[10] cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there are inconsistencies and contradictions among the medical records, his testimony, and other evidence. *Warner v. Com'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004). Here, the ALJ noted many inconsistencies between the record presented and Plaintiff's testimony about a multitude of disabling limitations based upon extreme and nearly constant pain.

Recapping Plaintiff's testimony, he stated he might have one "decent" day in an entire month "to where the pain level will stay at an eight instead of going to a nine, or to where I'm breaking down and crying."  (Tr. 75)  He reported that sitting during the hearing

---

[10]An ALJ's assessment of symptoms, formerly referred to as the "credibility" determination in SSR 96-7p, was clarified in SSR 16-3p to remove the word "credibility" and refocus the ALJ's attention on the "extent to which the symptoms can reasonably be accepted as <u>consistent</u> with the objective medical and other evidence in the individual's record."  SSR 16-3p, 2017 WL 5180304 at *2 (October 25, 2017) (emphasis added).

was causing "horrible pains," and that "[e]verything" in terms of postural activities worsens his pain, as does any lifting and carrying.  (Tr. 76).  He alleged he hasn't been able to walk normally without a cane since his 2008 surgery. (Tr. 70).  From 2014 through the date of the hearing, Plaintiff testified he could walk for only 5-10 minutes at a time (with a cane), and no more than 2-3 hours total in a day.  (Tr. 78-79).  He testified that he can also sit for no longer than 10 minutes or 1-2 hours total in an 8-hour day.  (Tr. 80).  He spends most of his day lying on his couch or reclined in his recliner with a heating pad.  (Tr. 80-81).  Plaintiff also testified to extreme limitations in his ability to focus or concentrate due to pain, anxiety and significant medication side effects from his Percocet, Xanax and Neurontin. (Tr. 82).  For example, he testified he cannot watch a 30 minute TV show without "getting up and doing something to try to better my pain or something or break down crying and tears because of hurting so bad."  (Tr. 83, 87).

If the ALJ had accepted Plaintiff's subjective reports, he would be disabled.  However, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record,"  and that the "overall record fails to support [Plaintiff's] allegations as to the disabling nature of his symptoms." (Tr. 33).  In support of that adverse finding and her RFC determination that Plaintiff remained capable of sedentary work with only "moderate" limitations in focus and concentration, the ALJ pointed to numerous discrepancies.  For example, notwithstanding Plaintiff's use of a cane at two consulting examinations and a functional capacity exam, most of Plaintiff's treatment records failed to reference *any* use of a cane.[11]  (Tr. 37).  The ALJ also

---

[11]The vocational expert opined that an individual with Plaintiff's RFC limitations would still be able to perform the same jobs even if he used a cane.  (Tr. 93-94).

referenced an ER record reporting that he was on vacation walking without his cane, and a telehealth visit with Dr. Rath in which he was noted to be walking in his yard without any limitations. (*Id.*)

Plaintiff recasts the ER record as suggesting that Plaintiff "tried to walk a little bit without using his cane" while on vacation but that "when he tried to do so he fell and broke his left wrist." (Doc. 10 at 13, citing Tr. 384). But Plaintiff's own characterization is not supported by the record, which does not refer to *any* cane use on vacation or at the time of the visit. Instead, the ER note states that Plaintiff had been on vacation in Myrtle Beach the prior week and that on "Wednesday…at approximately 2:00 in the morning due to restless leg" he was out for a walk when he went to try and jump and touch the [basketball] net when he slipped and fell landed on his left wrist." (Tr. 384). Plaintiff's argument also fails to note that the ER record was one of *many* records supporting the ALJ's determination that he is not medically required to use a cane.

In addition to the cane use, the ALJ discounted Plaintiff's allegations of disabling levels of anxiety and pain.

> There is minimal evidence to support disability, as there is only 539 pages of medical evidence since February 6, 2014. In addition, the evidence of record demonstrated activities contrary to the finding of disability, such as vacationing in Myrtle Beach, walking his dog, and caring for his infant daughter (4F, p.18, p.22; 14F, pp.3-4, p.6). Additionally, the claimant has reported to treatment providers that he was working on multiple occasions, which was not reported on his earnings record (5F, p.59, p.86, p.91, p.134, p.151; 23F, p.7). Additionally, since February 6, 2014, the claimant has primarily treated with his primary care provider, William Rath, D.O., until April 2019, when he initiated treatment with Hal Blatman, M.D., at Blatman Health and Wellness Center (23F, p.13). Nevertheless, treatment with Dr. Blatman has been similar with primarily only Percocet at the same dosage (23F, p.12). As for mental health, the claimant has only received conservative treatment with one-milligram of Xanax prescribed by his primary care provider (20F, p.6, p.18, *for example*). Furthermore, the few mental status examinations within the record are generally unremarkable with euthymic mood, appropriate affect, clear speech, logical and goal-

directed thoughts, and adequate recent and remote recall (7F, pp.4-5, *for example*).

(Tr. 37).

Picking apart the ALJ's analysis, Plaintiff takes aim at the comment on the number of medical records (539 pages) as "minimal evidence to support disability." (Doc. 10 at 23). While the total number of medical records is not determinative of disability, the ALJ's comment in context does not require reversal. A small number of records generated over a long period of years is often correlated with the type of conservative medical treatment that Plaintiff received. However, even if the comment was inappropriate, the content of the records strongly supports the ALJ's assessment. The ALJ reasonably points out many instances in which Plaintiff's reports to his physicians were inconsistent with disabling symptoms since 2014, including the alleged inability to walk, stand or sit for more than 10 minutes.

Attempting to reframe that evidence, Plaintiff argues that the ALJ should have evaluated Plaintiff's attempts to work after his alleged onset date as "unsuccessful work attempts" that supported his claim. At the hearing, counsel questioned Plaintiff about the references. Plaintiff testified that all activity was part-time and brief and that he was paid under the table at $10 per hour – less than SGA. For instance, he testified the tree service work lasted only three or four days. (Tr. 64). He testified that he worked only six hours per week in property management until he was fired after a short time for calling off too much. (Tr. 65). In stark contrast to records that noted his report of full-time sales employment for all of 2018, he testified that he worked only part-time for only three months until his boss told him not to come to work any more because of his disability. (Tr. 66).

The undersigned rejects Plaintiff's invitation to re-weigh the evidence in his favor. It was the ALJ's job to weigh the significant conflicts in the record between Plaintiff's

testimony and the medical records. Her assessment of his post-onset work activity as inconsistent with the disabling symptoms he alleges is substantially supported.[12]

For similar reasons, the undersigned finds no error in the ALJ's finding that Plaintiff has been "caring" for his infant daughter. Plaintiff points out that finding is contrary to his testimony that relatives provide all necessary child care, and pick her up place her on his lap only when he is seated in a chair or on the couch since he cannot lift more than 10-12 pounds. (Tr. 88). But multiple records support the ALJ's conclusion that Plaintiff actively participates in the care of his daughter. (*See*, *e.g.*, Tr. 807 (bringing his daughter to his appointment); Tr. 821 (complaint of increased pain taking care of 8-month-old); Tr. 822 ("loving" being a stay-at-home dad); Tr. 824 (up at night caring for child with colic)). Therefore, the ALJ's resolution of the conflict in evidence is substantially supported.

Last, Plaintiff complains that the ALJ focused too much on reports to his physicians that his medication was "helpful" without significant side effects, while ignoring reports on the same dates that even with medication, his pain remained at arguably disabling levels. However, the ALJ accurately pointed out that despite Plaintiff's *subjective* reports of his pain level to his prescribing physicians, multiple treating and examining physicians consistently and *objectively* observed him to be in "no distress" on nearly all occasions.

## 2. The ALJ's Evaluation of the Opinion Evidence

In his second claim, Plaintiff mostly challenges that ALJ's determination that the opinions offered by his two treating physicians,[13] Drs. Rath and Blatman, were "not

---

[12]Throughout the Statement of Errors, Plaintiff continually argues that the ALJ's determinations are "not based upon the preponderance of the evidence and the Court should so find." (*See*, *e.g.*, Doc. 10 at 34; id. at 27). This Court's review is limited to a determination of whether the ALJ's determination is supported by "substantial evidence."

[13]Because Plaintiff filed his application after March 27, 2017, revised regulations apply that eliminate the prior structure in which treating physician opinions were given "controlling weight" and other opinions were assigned lesser "weight" under a defined hierarchy of medical opinions. The new regulations require the

persuasive," particularly with respect to his focus and concentration. He also challenges the rejection of a functional capacity examination ("FCE") report on which they partially relied. And, as discussed below, Plaintiff further criticizes the ALJ's evaluation of the opinions of an examining psychologist, two non-examining psychologists, and two non-examining physicians. The only assessment Plaintiff does not criticize is the rejection of an examining consultant's opinion. The undersigned finds no reversible error.

### a. Summary of Opinion Evidence

The earliest opinion evidence is dated October 2019, from consulting psychologist Dr. Twehues. Dr. Twehues noted that Plaintiff had no history of mental health treatment and reported spending his time with his fiancée and her children and hanging out with his dog. She concluded that Plaintiff was not expected to have any limitations in understanding, remembering, and carrying out instructions; no severe limitations in maintaining attention and concentration, persistence, and pace for multi-step tasks; no limitations expected in responding appropriately to supervision and coworkers; and only mild to moderate limitations in responding appropriately to work pressures in a work setting. (Tr. 39; Tr. 769-775).

In November 2019 and in June 2020, two non-examining psychologists, Drs. O'Brien and Richardson, found insufficient evidence to assess Plaintiff's mental health impairments prior to his DLI, but found anxiety and obsessive-compulsive disorders at the time he filed his applications. (Tr. 118-19, 135-36, 151-52, 165-67). Drs. O'Brien and Richardson found only mild limitations in concentrating, persisting or maintaining pace,

---

ALJ to determine the "persuasiveness" of each prior administrative medical finding or other medical opinion based upon a list of factors, of which the most important are "supportability" and "consistency." *See* 20 C.F.R. § 404.1520c(b)(2).

and moderate limitations in adapting or managing oneself.  Dr. Richardson opined that Plaintiff would be able to perform simple, routine work tasks that do not involve prolonged concentration for task completion; no demands for fast pace or high production quotas; and changes in duties should be infrequent in nature.  (*Id*.; Tr. 38).

In November 2019, Plaintiff underwent a consultative physical examination by Dr. Fritzhand.  Dr. Fritzhand was uncertain about the cause of the claimant's ongoing severe musculoskeletal complaints and opined he was unable to assess *any* physical functional impairments at all.[14]

In December 2019, after having treated Plaintiff for 8 months, Dr. Blatman opined that Plaintiff suffers from extreme functional limitations due to his chronic pain.

> To compensate for the pain from his injuries he needs to change positions frequently and has to lie down a lot throughout the day.  In addition, high doses of opioid medication are no longer available, and his level of chronic pain at these low doses will cause him to be off task at least 40% of the time due to impaired focus, attention and concentration.
>
> He also would not be a reliable employee, and would not be able to wake up every day and attend, much less on time.
>
> It is therefore my opinion within a reasonable degree of medical certainty that [Plaintiff] is totally disabled from any occupation.

(Tr. 790).

> On February 5, 2020, Dr. Rath offered the following narrative opinion:
>
> [C]hronic pain adversely affects his activities of daily living and standing for any length of time. This in turn affects his ability to be gainfully employed in his area of interests and ability. Also, the chronic pain increases the degree of chronic anxiety which causes the feeling of "off task" with decreased concentration and poor focusing on given tasks.  Also, it needs to be noted that he ceased going to school due to cost which is directly related to his inability to maintain a gainful employment.

---

[14] Plaintiff does not challenge the ALJ's assessment of Dr. Fritzhand's opinion as "not persuasive." Therefore, the undersigned does not further discuss this opinion.

> I agree that this patient truly has a significant degree of disability, however, I don't think it is to the level of total disability. I would recommend this patient to investigate…an occupational therapy program and work hardening program to see if he could tolerate more clerical employment with proper therapy and training.

(Tr. 793).

In February and June 2020, respectively, non-examining consultants Drs. Manos and Mikalov reviewed the record including the opinion letters from Drs. Twehues, Fritzhand and Rath; Dr. Mikalov also reviewed Dr. Blatman's December 2019 letter. Dr. Manos generally opined that she was unable to assess any limitations prior to Plaintiff's DLI, but that as of the date of his applications, Plaintiff could work at the "light" exertional level.[15] (Tr. 113-118). However, Dr. Manos restricted standing and/or walking 2 hours and sitting to 6 hours in an 8-hour workday, and included additional non-exertional limitations. Dr. Mikalov largely agreed with Dr. Manos, but restricted hazards in a slightly different manner. (Tr. 146-151).

On September 30, 2020, Plaintiff underwent a functional capacity evaluation ("FCE") by a physical therapist, Ms. Scholl. Ms. Scholl sent her 2-page report to Dr. Rath along with a "Medical Source Statement" check-box form representing her findings. (858-860). Ms. Scholl opined that as of the date of the FCE, Plaintiff could sit for 5-10 minutes at a time for 1-2 hours per day, stand for 5-10 minutes at a time, walk for 10-15 minutes at a time for a total standing/walking time of 2-3 hours per day, could never lift 10 pounds, and could only occasionally lift less.[16] (Tr. 817-818). The form also states that Plaintiff will need 3-4 unscheduled rest periods per day.

---

[15]Plaintiff mistakenly states that they limited him to the sedentary level of exertion. (Doc. 10 at 29). At various times in his brief, he also mistakenly refers to the ALJ giving their opinions "persuasive" weight.
[16]While not specifically discussed by the ALJ, Plaintiff testified at the hearing that he could lift 10-12 pounds – an amount that exceeds Ms. Scholl's lifting restrictions.

20

On November 3, 2020, Dr. Rath co-signed the check-box Medical Source Statement form that Ms. Scholl had completed, endorsing the same FCE limitations.  (Tr. 859).  Dr. Rath also offered a new narrative opinion that Plaintiff was disabled, revising and retracting his February 5, 2020 letter based on the FCE.

> In my prior letter…I indicated that I wasn't sure that the patient was totally disabled and I recommended …investigation to see if he could tolerate…clerical [activities].  I see from the… [FCE] that …the patient had significant functional limitations even with keyboarding and with picking up small very light objects.
>
> Based upon this evaluation I do feel that this patient has been incapable of working full-time hours even in a sedentary capacity.  His pain would be too great and… he would be off task quite a bit and far too much to do anything consistently or productively. The Medical Source Statement which accompanies my report sets forth the specific limitations that I feel the patient to have had for several years.  Looking back, and reviewing my entire chart, it is my opinion that the patient has in all probability been at this level of functional limitation since I first began treating him in 2011 and certainly well prior to…September 30, 2017.

(Tr. 858).

Dr. Blatman offered a similar second opinion based on the FCE report, opining it was "in line with what I would have expected" and "consistent with what I have observed…and…found during physical examinations." (Tr. 831).  Dr. Blatman opines that "any significant increase in physical activity can bring unexpected disabling pain," and states that Plaintiff "is too limited to work consistent hours on even a part time basis in any job" and "is totally and permanently disabled from all occupations."  (*Id.*)

### b.    The ALJ's Analysis is Substantially Supported

The ALJ rejected the two opinions by Dr. Blatman, as well as the two opinions by Dr. Rath and the FCE opinions of Ms. Scholl, as "not persuasive." The new regulations permit an ALJ to consider multiple opinions from a single physician in combination. Although the ALJ did this to some extent, she also discussed differences between the two

opinions offered by each treating physician given that their November 2020 opinions were based on Ms. Scholl's FCE.

With respect to Dr. Rath, the ALJ first rejected the February 2020 narrative opinion letter as neither supported by Dr. Rath's own records nor consistent with the longitudinal record as a whole:

> These conclusory statements provide little to no value in determining the claimant's functional limitations. Further, determinations on the penultimate issue of whether or not an individual is disabled are reserved for the Commissioner. … As to other portions of his opinion, such as off task time, mental status exams do not show abnormalities in attention or concentration to support this opinion (*i.e.,* 20F). As to his opinion that the claimant cannot ambulate effectively, physical exams do not show this to be in the case on any ongoing basis (20F).

(Tr. 40). The ALJ's summary of the physical exam evidence is correct. Contrasting the clinical record with Dr. Rath's vague suggestions that Plaintiff's chronic pain impacted his ability to stand for "any length of time" and that Plaintiff had "decreased concentration and poor focusing," the undersigned finds the ALJ's analysis to be substantially supported.

Turning to the FCE and Medical Source Statement completed by Ms. Scholl, the ALJ explained why it was not supportable or consistent with Ms. Scholl's own examination findings or the longitudinal record:

> Ms. Scholl had the opportunity to examine the claimant but only on one occasion, and not in a treating capacity. In addition, Ms. Scholl appears to have relied upon the claimant's subjective complaints and self-reported limitations of lifestyle activities in making these determinations…. Conversely, Ms. Scholl's examination noted fifty percent flexion of the lower back and neck, and right ankle five degrees from neutral, otherwise normal range of motion of the bilateral shoulders, elbows, wrists, fingers, hips, knees, and left Ankle…. In addition, the claimant did not require the use of an assistive device …. Further, this opinion is not consistent with the longitudinal medical evidence of record, which contained minimal findings on examinations and only conservative treatment measures with ten-milligrams of prescription Percocet (14F, pp.3-4, pp.5-6, *for example*).

(Tr. 40).

22

Returning to Dr. Rath's co-signed copy of that Medical Source Statement, submitted with a second opinion letter in November 2020 based on the FCE results, the ALJ correctly discounted the opinion that Plaintiff was disabled as a determination "reserved only for the Commissioner." (Tr. 40). As for the Medical Source Statement, the ALJ again reasonably explained that the opinions were not supportable because Dr. Rath's own examination records contradicted the stated limitations and because the extreme limitations were inconsistent with the longitudinal record.

> [C]linical signs and findings, and diagnostic testing within the longitudinal medical evidence does not support these extreme limitations. In addition, Dr. Rath's own examination findings documented the claimant walking in his yard with no noticeable limitations in June 2020 (20F, p.5, *for example*). Mental status exams do not show attention or concentration deficits (*i.e.,* 20F).

(Tr. 40). The undersigned therefore finds no error in the ALJ's analysis of the FCE and of both of Dr. Rath's narrative opinions as "not persuasive."

The ALJ similarly rejected the December 2019 and November 2020 opinion letters authored by Dr. Blatman. Of the two letters, the November 2020 letter was more specific in that it endorsed the FCE functional limitations as "in line with" and "consistent with" his observations and examination findings. Both letters emphasized Dr. Blatman's opinion that Plaintiff was completely disabled, adding in November that Plaintiff was "too limited to be able to work consistent hours on even a part time basis in any job." (Tr. 831). However, the ALJ properly rejected the "disability" portions of Dr. Blatman's opinion letters because that determination is "reserved only for the Commissioner." (Tr. 39). As to functional limitations, the ALJ explained:

> Nevertheless, Dr. Blatman's opinion is not supported by the examinations of record or conservative treatment measures, which does not rise to the level of severity or frequency opined. For example, Dr. Blatman's examinations have mainly documented only generalized spasms and tenderness (23F, p.1, p.3, p.5). Dr. Blatman's treatment records have also

23

consistently noted that the medication prescribed continued to be helpful in reducing pain, allowing for physical activity and rest with no significant side effects (14F, p,1, p.4, p.6, for example).

(Tr. 39; *see also* Tr. 40 (offering additional examples of Dr. Blatman's examination records that documented only generalized spasms and tenderness in contrast to his narrative opinions describing high levels of disabling pain and extreme postural limitations)).  While the ALJ's analysis of why Dr. Blatman's opinions were not supportable or consistent with either his own examination records or the longitudinal clinical record was somewhat brief, the analysis is reasonably and substantially supported on the record presented.

Plaintiff's main argument is that the ALJ should have found disabling impairments based upon his chronic pain.   Even though the ALJ found the consulting opinions of Drs. Manos and Mikalov to be only "partially persuasive," Plaintiff complains that the ALJ should not have relied on their opinions at all because they did not have access to complete records.  Specifically, Dr. Manos did not have access to Dr. Blatman's opinion letter or to his records.  Dr. Mikalov had access to Dr. Blatman's February 2020 opinion letter, but rejected it because no treatment records had yet been received. (Tr. 148-149).[17] And Plaintiff complains that "neither Dr. Manos nor Dr. Mikalov appear to have bothered to review Dr. Rath's initial records," given that they found insufficient medical evidence to evaluate his limitations prior to Plaintiff's September 30, 2017 DLI.

However, none of those factors impacted the ALJ's substantially supported analysis.   The ALJ clearly considered and discussed *all* of the opinion letters and treatment records, including the many references to various types of post-onset work

---

[17]Plaintiff asserts that Dr. Mikalov made an additional factual error in stating that Plaintiff had been "in car sales for years" prior to filing his 2019 application.  (Tr. 147).  As discussed above, the record reflects only one year of car sales, with other work in property management.

activity.  The ALJ relied on those records in assessing multiple limitations from the alleged onset of disability in 2014 (contrary to Drs. Manos and Mikalov), when she explained why she was rejecting the opinions of Drs. Manos and Mikalov that Plaintiff could perform light work and limiting him to sedentary work, and when she assessed additional non-exertional limitations.  (Tr. 38).  Therefore, I find no error in the ALJ's decision not to completely reject the consulting physicians' opinions based on the longitudinal record.

Plaintiff similarly complains that it was error to afford the examining psychologist's opinions any value.  He asserts:  "Dr. Twehues was clearly basing her opinions solely on the limitations that she felt [Plaintiff] would have in these areas of function <u>secondary only to his unspecified anxiety disorder</u>," which is "highly problematic in that [Plaintiff]s problems with focus, attention and concentration were much more <u>attributable to the distracting effects of his chronic pain</u>."  (Doc. 10 at 33-34 (emphasis original)).  The undersigned disagrees.

Like the consulting physicians - and contrary to Plaintiff's suggestion that the ALJ found them to be "persuasive" - the ALJ found Dr. Twehues's opinions to be only "partially persuasive." The ALJ pointed out that "there are few mental status examinations in the record to support *any* limitations." (Tr. 39, emphasis added).  Still, based specifically on her consideration of the longitudinal record,  the ALJ assessed greater mental limitations overall than found by Dr. Twehues.[18]  (Tr. 39).

A review of Dr. Twehues's report refutes Plaintiff's argument that she considered only anxiety without regard to his physical status.  The report includes an evaluation of Plaintiff's physical presentation and how that impacted his mental status (including pain

---

[18]For example, the ALJ found "moderate" limitations rather than no limitations in understanding, remembering, and carrying out instructions and adapting and managing himself.  (Tr. 39).

complaints) throughout the clinical interview. (*See*, *e.g.*, Tr. 769 (stating he is seeking disability due to falling off a ladder and shattering his right heel); Tr. 770 (physical health history section); Tr. 771 (appearance and behavior section)). In evaluating limitations in maintaining attention, concentration, persistence and pace, Dr. Twehues also noted that he reported leaving "his most recent job due to physical health problems" as opposed to any mental limitations. (Tr. 773). The ALJ agreed with Dr. Twehues that Plaintiff would have "mild to moderate difficulty sustaining focus for prolonged periods," and that he would be "prone to somewhat higher than usual rates of absenteeism from work." (Tr. 773). She also agreed that "increased stress and pressure would likely make it somewhat more difficult for him to focus and persist on work-related tasks." (*Id.*) However, Dr. Twehues never suggested that Plaintiff was precluded from all work, and noted that he left his last job in car sales "due to physical health problems" rather than mental limitations. (Id.)

The ALJ reasonably translated Dr. Twehues's opinions to a limitation to unskilled work consisting of "simple, routine work tasks that do not involve prolonged concentration for task completion," with "no demands for fast pace or high production quotas" and "infrequent" changes to reduce job stress, which RFC limitations were consistent with the functional limitations assessed by non-examining psychologist, Dr. Richardson. (Tr. 39). The ALJ also stressed that her assessment of greater mental RFC limitations than found by Dr. Twehues was based specifically upon of Plaintiff's "anxiety in combination with the claimant's complaints of pain." (Tr. 39). The undersigned therefore finds the assessment of Dr. Twehues's opinions to be substantially supported.

The undersigned also finds the ALJ's evaluation of the opinions of both Dr. Richardson and a second non-examining psychologist, Dr. O'Brien, to be substantially

supported.    It is worth noting that despite finding their opinions to be "persuasive," the ALJ rejected their opinions that there was insufficient evidence to assess Plaintiff's mental health impairments prior to his DLI, and further rejected their opinions that Plaintiff had only "mild" rather than "moderate" limitations in concentrating, persisting or maintaining pace. (Tr. 118-19, 135-36, 151-52, 165-67; *see also* Tr. 31, 38, 39).  The ALJ reasonably determined that their opinions were supportable and consistent insofar as they correctly analyzed "the mental health evidence available at the time of their reviews," which was necessarily limited.   (Tr. 38).

Relevant to his attack on the ALJ's assessment of his mental limitations, Plaintiff further argues that the ALJ should have found that his inability to focus or concentrate was at a disabling level based upon his subjective complaints and the opinions of Drs. Rath and Blatman.[19]  He further argues that the ALJ should have found, based upon Dr. Blatman's opinions that Plaintiff would not be "reliable" and "is too limited to be able to work consistent hours on even a part time basis," that he would miss too much work to retain an unskilled job.[20] Plaintiff faults the ALJ for citing evidence that mental status exams conducted by Drs. Rath and Blatman showed no abnormalities at all in attention or concentration, rationalizing that neither physician was a mental health practitioner who would be "actively looking" for such deficits.  Alternatively, Plaintiff argues that the mental

---

[19]At the hearing, Plaintiff's counsel questioned the VE extensively about Plaintiff's limitations in focus and concentration, asking for an explanation of how an individual could work as an inspector if he cannot sustain "prolonged concentration."  (Tr. 95).  The VE explained that the type of "unskilled" inspection jobs on which he relied do not require prolonged concentration, such as the inspection of dowels for gross defects or "flaws such as square ends, knots, or splits." (Tr. 96).

[20]Plaintiff citation to the recent case of *Palmore v. Commissioner of Social Security* is unpersuasive. *Palmore* is easily distinguished on its facts, which involved far more significant medical records in support of specific opinions on "off task" limitations and absenteeism.  *See id*., 2021 WL 1169099, at *7 (S.D. Ohio, March 29, 2021) (discussing frequent hospitalizations and other medical records that strongly supported those opinions, and the absence of any rationale for rejecting them).

status exams during brief office visits "would not say anything about or correlate to the extent to which he could reasonably be expected to be 'off task' due to pain" over a full workday.

Plaintiff's argument is illogical and unpersuasive. He acknowledges that neither of his physicians had any objective data (other than their own clinical observations that objectively and consistently revealed normal mental status exams) and are not skilled mental health practitioners trained to assess mental limitations.  With that concession, it would make little sense for the ALJ to find less persuasive the opinions of three trained mental health professionals, and to further ignore all of the *objective* mental health status evidence of record including all clinical records.

In sum, the ALJ's analysis of the opinion evidence is substantially supported, including her conclusion that Plaintiff has more than the "mild" limitations found by Dr. Twehues but less than the disabling level of limitations found by Drs. Rath and Blatman. "When considering the medical evidence and calculating the RFC, an ALJ is free to resolve issues of credibility as to lay testimony, or to choose between properly submitted medical opinions." *Toohey v. Com'r of Soc. Sec.*, 2021 WL 940288, at *7 (S.D. Ohio March 12, 2021) (internal quotation marks and citation omitted).  A court may not reverse even if there is substantial evidence to support an alternative conclusion, so long as the ALJ's analysis falls within a "zone of choice."  That standard is met here.

### III.  Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's decision be **AFFIRMED** and that this case be **CLOSED.**

 *s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

NICHOLAS V.,                                          Case No. 1:21-cv-408

       Plaintiff,                                    Dlott, J.

   v.                                                  Bowman, M.J.

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).